UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
Civil No. 09-312(DSD/AJB)

C.B. by and through his
parents, B.B and C.B.,

   Plaintiffs,

v.              **ORDER**

Special School District No. 1,
Minneapolis, Minnesota,

   Defendant.

  Margaret O'Sullivan Kane, Esq., 1654 Grand Avenue, Suite
  200, St. Paul, MN 55105, counsel for plaintiff.

  Laura Tubbs Booth, Esq., 1820 Xenium Lane North,
  Plymouth, MN 55441, counsel for defendant.

This matter is before the court on the parties' cross-motions for summary judgment. Based upon a review of the file, record and proceedings herein, and for the reasons stated, the court grants defendant's motion.

**BACKGROUND**

This case arises under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. § 1400 et seq. Plaintiff C.B. is a minor with a learning disability who attended Hale Elementary School ("Hale") from 2002 to 2007. Hale is a public school in defendant Special School District No. 1 ("District"). (A.R. Ex. 74 at 37.)

C.B. began kindergarten at Hale in fall 2002. Shortly thereafter, the District began providing reading assistance to C.B. in his general education classroom. (A.R. Ex. 30 at 4-5.) C.B.'s reading skills did not improve, and in November 2003 the District created an independent education program ("IEP") team[1] to assess his skills and develop an IEP.[2] (A.R. Ex. 32 at 21.) A January 2004 evaluation indicated that "despite receiving additional small group and individualized reading instruction," C.B. was "severely underachieving in basic reading" and his reading skills were "significantly discrepant from the expected level for his age." (Id. at 25.) For instance, on the Woodcock Johnson III Achievement Test ("Woodcock Johnson test"), C.B. placed in the first percentile in reading relative to his peers. (Id. at 22.) As a result, the IEP team concluded that C.B. was eligible for special education services "to increase his reading skills in the areas of letter and

---

[1] The IEP team included C.B.'s parents, three general education teachers, a District representative, a psychologist, a speech language clinician and a special education resource teacher. (A.R. Ex. 33 at 36.)

[2] An IEP is a written statement of (1) the child's present levels of academic achievement and functional performance, (2) measurable annual academic and functional goals designed to meet the child's needs, (3) how the child's progress toward meeting the annual goals will be measured, (4) the special education and related services to be provided to the child, (5) the extent, if any, to which the child will not participate with non-disabled children in the regular class, (6) any accommodations that are necessary to measure the academic achievement of the child and (7) the projected date for the beginning of the services. See 34 C.F.R. § 300.320.

2

sound recognition, writing of alphabet letters, sight word recognition, decoding skills and reading fluency." (Id. at 25; Ex. 33 at 37.)

The goal of C.B.'s first grade IEP was to "increase his reading skills from a readiness level to a first grade level." (A.R. Ex. 33 at 37.) To accomplish this, the District provided C.B. with thirty minutes of daily direct instruction from special education teacher Lynda Kelley ("Kelley"). A June 10, 2004, report indicated that C.B. had made "slow progress" toward the IEP goal and that he could read first grade material at a rate of thirteen words per minute. This fell far short of the sixty-five-word-per-minute rate expected of students who have completed first grade. (A.R. Ex. 31 at 1-2; Ex. 76 at 671.)

C.B.'s second and third grade IEPs set forth the same goal as the first grade IEP. (A.R. Ex. 37 at 14; Ex. 38 at 8.) At this time, the District was providing C.B. sixty minutes per day of direct reading instruction and forty minutes per week of direct instruction in study skills. (A.R. Ex. 45.) Reports in June and September 2005, however, again indicated that C.B. had made "slow progress." By the end of third grade, C.B. could read first grade material at a rate of thirty-three words per minute. (A.R. Ex. 35 at 1; Ex. 38 at 8; Ex. 52 at 20.)

Kelley tutored C.B. in the Orton-Gillingham reading program for a total of nine hours during the summer between third and

fourth grade. (A.R. Ex. 75 at 472.) According to Kelley, C.B. "responded well" to the program and his reading scores improved. (A.R. Ex. 44; Ex. 75 at 472.) When C.B. returned to Hale for fourth grade in fall 2006, however, Kelley noted that he had regressed. (A.R. Ex. 75 at 506.)

Due to the ongoing concerns about C.B.'s skill level, the District conducted a comprehensive reevaluation of his performance and educational needs in October 2006. (A.R. Ex. 43 at 45.) The evaluation again determined that C.B. was "severely underachieving" in reading and writing. (Id. at 55.) C.B.'s standard score in reading on the Woodcock Johnson test placed him in the .10 percentile relative to his peers. (Id. at 48; Ex. 76 at 599.) Furthermore, the report noted a "severe discrepancy" between C.B.'s underachievement in reading and writing and his "average" intellectual ability. (A.R. Ex. 43 at 56.)

At an October 12, 2006, IEP team meeting, the District recommended that C.B. transfer to a public school in Minneapolis that offered the Federal Setting III Coordinated Learning for Academic and Social Success Program ("CLASS program"). (A.R. Ex. 46 at 1; Ex. 75 at 523.) The CLASS program provides a special, research-based curriculum designed for elementary school students with severe disabilities. (A.R. Ex. 46 at 1-2; Ex. 76 at 713-14.) Students in the CLASS program receive small group and one-on-one special education instruction and spend thirty percent of their day

4

in the general education environment. (A.R. Ex. 46 at 1-2; Ex. 75 at 524-25.) C.B.'s mother, however, refused to pursue the CLASS program because C.B. had friends at Hale and she was concerned that transferring schools would negatively impact his self-esteem and social skills. (A.R. Ex. 74 at 211-12; Ex. 75 at 525-26.) As a result, the District did not include the CLASS program in C.B.'s IEP. (A.R. Ex. 76 at 702-03.)

The goal of C.B.'s fourth grade IEP was to "increase his reading skills from a beginning first grade level to an end of first grade level." (A.R. Ex. 42 at 32.) To achieve this goal, Kelley used three different reading programs with C.B., including the Orton-Gillingham program, and tracked C.B.'s reading fluency each week. (A.R. Ex. 75 at 468.) By the end of the fourth grade, C.B. could read first grade material at a rate of sixty words per minute. (A.R. Ex. 52 at 22, Ex. 75 at 548.) This rate, however, remained well behind the 132 words per minute of fourth grade material expected of students finishing the fourth grade. (A.R. Ex. 42 at 32; Ex. 75 at 550-52.)

C.B. attended Field Community School in Minneapolis for fifth grade. (A.R. Ex. 49.) At the beginning of the school year, C.B.'s reading rate had dropped to forty-two words per minute at a first grade level. (A.R. Ex. 59 at 236.) At a September 2007 meeting,

C.B.'s mother again refused the IEP team's recommendation to transfer C.B. to the CLASS program, and the program was not included in the IEP. (A.R. Ex. 74 at 132-33; Ex. 76 at 738.)

The goal of C.B.'s fifth grade IEP was to "increase his reading skills from a first grade level to a second grade level." (A.R. Ex. 59 at 236.) A progress report written at the end of the school year stated that C.B. had made "slight progress" toward this goal and could read second grade material at a rate of fifty-five words per minute. (A.R. Ex. 58 at 209.) C.B.'s mother, however, believed that the report overestimated C.B.'s abilities and contacted Dr. Susan Sorti ("Sorti") to conduct a cognitive neuropsychological assessment of C.B. (A.R. Ex. 74 at 148-50, 152-53.) After a June 2008 evaluation, Sorti concluded that C.B. had "average intellectual capabilities," but noted that "in the language arts realm, his performance ... is in the single-digit percentiles. General reading rate and comprehension are severely limited." (A.R. Ex. 50 at 42-43.) Sorti diagnosed C.B. with an auditory processing disorder, dysgraphia and dyslexia and recommended that C.B. attend Groves Academy ("Groves"), a private school that specializes in educating children with learning disorders. (Id. at 33, 42-43; Ex. 74 at 156-57; Ex. 75 at 278.) C.B.'s mother immediately began the process of enrolling C.B. at Groves. (A.R. Ex. 74 at 157.)

On July 17, 2008, C.B.'s parents notified the District that they intended to enroll C.B. at Groves because his special education program "continues to remain the same with little change year after year to the goals and objectives" and "recent outside testing reflected that C.B. has made no demonstrable progress." (A.R. Ex. 51 at 1; Ex. 74 at 162-63.) In addition, C.B.'s parents asked the District to pay for C.B.'s tuition at Groves. (A.R. Ex. 51 at 1; Ex. 74 at 162-63.) The District refused this request by letter on July 21, 2008, stating that C.B.'s "level of direct service in reading has increased each year," and C.B. is "making slow but steady progress." (A.R. Ex. 51 at 2, 4.) Furthermore, the letter noted that the District had twice recommended that C.B. transfer to the CLASS program but that C.B.'s parents had rejected this option. (Id. at 4.) Lastly, the District offered to hold an IEP team meeting to discuss the concerns of C.B.'s parents. (Id.) C.B.'s parents rejected the District's offer and on August 27, 2008, signed an enrollment contract with Groves. (A.R. Ex. 50 at 31-32.)

On September 1, 2008, C.B.'s parents requested a special education administrative hearing pursuant to 34 C.F.R. § 300.532(a) to contest the District's reimbursement decision. Hearings occurred before an independent hearing officer ("IHO") for three days beginning on November 19, 2008. After receiving exhibits and listening to the testimony of witnesses, the IHO determined in a

7

December 19, 2009, order that the District did not provide C.B. a free and appropriate public education ("FAPE"), that Groves was an appropriate placement and that C.B., by and through his parents, was entitled to $6,800 for the cost of enrollment at Groves for the 2008 to 2009 school year. (IHO Order at 19, 22, 25.) C.B. brought this action on February 9, 2009, seeking attorney's fees and costs arising from the administrative hearing. The District filed a counterclaim on March 4, 2009, appealing the IHO's decision. The parties' separate motions for summary judgment are now before the court.

**DISCUSSION**

**I. Standard of Review**

"Because judges are not trained educators, judicial review under the IDEA is limited." E.S. v. Indep. Sch. Dist., No. 196 Rosemount-Apple Valley, 135 F.3d 566, 569 (8th Cir. 1998). Although the court must base its decision on the preponderance of the evidence, it must also give "due weight" to the results of administrative proceedings and resist "any impulse to 'substitute [its] own notions of sound educational policy for those of the school authorities.'" Id. at 569 (alteration in original) (quoting Bd. of Educ. v. Rowley, 458 U.S. 176, 206 (1998)); see also Neosho

R-V Sch. Dist. v. Clark, 315 F.3d 1022, 1028 (8th Cir. 2003). The burden of proof rests upon the party challenging the administrative decision. E.S., 135 F.3d at 569.

**II. The District's Appeal**

On appeal, the District argues that the IHO erroneously ordered it to reimburse C.B.'s parents for tuition at Groves. Under IDEA, the court may require a district to reimburse parents for the cost of private school "when a public school fails to provide a FAPE and a child's parents place the child in an appropriate private school," even if such placement occurs without the public school's consent. See Forest Grove Sch. Dist. v. T.A., --- S. Ct. ---, No. 08-305, 2009 WL 1738644, at *2 (June 22, 2009) (citing Sch. Comm. of Burlington v. Dep't. of Educ., 471 U.S. 359, 370 (1985)); see also U.S.C. § 1412(1)(C)(ii). "Parents who enroll their child in private school without the approval of the public school district, however, do so with the risk they will not receive reimbursement for their costs." See Fort Zumwalt Sch. Dist. v. Clynes, 119 F.3d 607, 611-12 (8th Cir. 1997). The District maintains that reimbursement is not warranted because it provided C.B. a FAPE and Groves was not an appropriate placement for C.B.

    **A. FAPE**

The overriding concern of the IDEA judicial review process is to ensure that the child has been provided access to a FAPE. See id. at 610. Whether a FAPE has been provided presents a mixed

9

question of law and fact.  See id. at 611.  An educational agency provides a FAPE when it complies with IDEA procedures and offers an educational program "'reasonably calculated to enable the child to receive educational benefits." Rowley, 458 U.S. at 206-07.  The substantive requirements of IDEA are viewed in the light of limited public resources.  See Fort Zumwalt, 119 F.3d at 611.  Accordingly, "IDEA does not require that a school either maximize a student's potential or provide the best possible education at public expense."  Id. at 611 (citing Rowley, 458 U.S. at 203).  Rather, IDEA is satisfied when the educational agency provides individualized education and services sufficient to provide the disabled child with "some educational benefit."  Neosho R-V, 315 F.3d at 1027.  A student's academic progress is an important indicia of whether a school district provided a FAPE.  See CJN v. Minneapolis Pub. Schs., 323 F.3d 630, 642 (8th Cir. 2003).

The District acknowledges that C.B. did not make the progress it hoped he would make in reading.  Nevertheless, the District argues that it provided C.B. a FAPE because his IEP was reasonably calculated to provide him an educational benefit and he made slow but steady progress.  The record, however, shows that from January 2004 to June 2008, C.B.'s reading skills remained severely limited and he made little to no progress between the first and fifth grades.  Despite C.B.'s average intellectual abilities, his standardized test scores in reading remained low over a period of

five years and he was still reading at a first grade level at the end of fifth grade. Therefore, the District has not shown by a preponderance of the evidence that C.B.'s IEP provided an educational benefit and the court affirms the IHO's determination that the District did not provide C.B. a FAPE.[3]

**B.   Appropriate Placement**

A primary objective of the IDEA is to educate children with disabilities in the least restrictive environment. See 20 U.S.C. § 1412(a)(5); Pachl v. Seagren, 453 F.3d 1064, 1067 (8th Cir. 2006). This means that children with disabilities must be educated "in a classroom along with children who are not disabled to the maximum extent possible." Blackmon ex rel. Blackmon v. Springfield R-XII Sch. Dist., 198 F.3d 648, 661 (8th Cir. 1999) (citing 20 U.S.C. § 1412(a)(5)(A)). Placement of a child with disabilities in a segregated learning environment is appropriate "'only when the nature or severity of the disability is such that education in regular classes with the use of supplementary aids and services cannot be achieved satisfactorily.'" Fort Zumwalt, 119 F.3d at 614 (quoting 20 U.S.C. § 1412(a)(5)(A)). IDEA's "strong preference" that children with disabilities attend regular classes with

---

[3] The court notes that the refusal of C.B.'s parents to consent to the CLASS program did not relieve the District of its obligation to provide C.B. a FAPE. See 20 U.S.C. §§ 1414(a)(1)(D)(ii)(II), 1415(b)(3)(A); Cone v. Randolph County Schs. Bd. of Educ., No. 1:06-579, 2006 WL 3000445, at *5 (M.D.N.C. Oct. 20, 2006) (district need not provide FAPE if parents reject district's written notice of proposed placement).

11

children who are not disabled "gives rise to a presumption in favor of [] placement in the public schools." See Indep. Sch. Dist. No. 283 v. S.D., 88 F.3d 556, 561 (8th Cir. 1996).

As an initial matter, the court determines that Groves is a segregated learning environment. Ninety percent of the students at Groves have IEPs and the remaining students have some learning or attention issues. Indeed, Groves' director of diagnostic services described Groves as "a day school for students with learning disorders." (IHO Order at 25.)

Moreover, the record does not show that the nature and severity of C.B.'s learning disability could not be adequately addressed in the less restrictive public school setting. The IHO did not find that C.B.'s disability required placement in a segregated program, nor did the IHO explain why IDEA's preference for public education should be ignored in this case. Rather, the record shows that the CLASS program offered educational services similar to Groves but in a less restricted environment. (A.R. Ex. 46 at 1-2; Ex. 75 at 524-25; Ex. 76 at 709, 713-14.) Additionally, C.B. benefitted from the social opportunities available in the general education environment, and although C.B. was severely disabled in the language arts, he performed well in other subjects and had an average intellectual capacity. (A.R. Ex. 74 at 211-12; Ex. 75 at 554-55.) Significantly, Kelley testified that prior to C.B.'s transfer to Groves, no member of his IEP team had suggested

12

that he needed a totally segregated, private school environment to make academic progress. (A.R. Ex. 75 at 555.) Therefore, the preponderance of the evidence establishes that Groves is not an appropriate placement for C.B. because it does not offer him an education in the least restrictive environment. Accordingly, the court reverses the IHO's decision, and the District need not reimburse C.B. for tuition at Groves.

## III. Attorney's Fees

The IDEA provides that "the court, in its discretion, may award reasonable attorneys' fees [to the] prevailing party." 20 U.S.C. § 1415(i)(3)(B). A litigant is a "prevailing party" if he obtains "actual relief on the merits of the claim that materially altered the legal relationship between the parties by modifying the defendant's behavior in a way that directly benefits the plaintiff." <u>Drennan v. Pulaski County Special Sch. Dist.</u>, 458 F.3d 755, 756-57 (8th Cir. 2006). Because C.B. has not shown that Groves was an appropriate placement, C.B. is not a prevailing party and attorney's fees are not warranted.

## CONCLUSION

Accordingly, based upon the above, **IT IS HEREBY ORDERED** that:

1. Plaintiff's motion for summary judgment [Doc. No. 29] is denied; and

2. Defendant's motion for summary judgment [Doc. No. 13] is granted.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: July 20, 2009

                                                                  <u>s/David S. Doty</u>
                                                                   David S. Doty, Judge
                                                                   United States District Court